| | | |
|---|---|---|
| TERI MYERS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | NO. 2:16-CV-00096 |
| | ) | REEVES/CORKER |
| GREENE COUNTY BOARD OF | ) | |
| EDUCATION and DAVID McLAIN, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

In April 2016, Teri Myers initiated this civil-rights suit against the Greene County Board

of Education and its Director of Schools, David McLain, bringing claims under 42 U.S.C. § 1983

and the Americans with Disabilities Act. In January 2018, both defendants moved for summary

judgment [D. 88, 90]. Upon learning the parties were scheduled to mediate on March 23, 2018,

the Court stayed all proceedings in this case and ordered the parties to submit a joint status report

within 30 days after the conclusion of mediation [D. 110].

On April 9, 2018, the parties informed the Court that mediation was unsuccessful [D. 111].

Consequently, the Court lifted the stay and ordered Myers to respond to the pending motions for

summary judgment on or before April 30, 2018 [D. 112]. Myers timely filed a joint response to

the motions [D. 113], and Defendants replied individually [D. 117, 118]. Thus, as of May 7, 2018,

the dispositive motions had been fully briefed and were ripe for adjudication by this Court.

As it turns out, the parties continued to engage in settlement discussions even after formal

mediation had concluded. But neither side moved to stay consideration of the pending dispositive

motions or otherwise informed the Court that settlement negotiations were ongoing. Accordingly,

on June 18, 2018, the Court entered a memorandum opinion granting Defendants' motions for summary judgment, and issued a judgment dismissing this case with prejudice.

Shortly after the opinion and judgment were filed, Myers's counsel called the Court to advise that the parties had reached a settlement. Faced with this new (and surprising) information, the Court elected to rescind the 23-page memorandum opinion and judgment and ordered the parties to submit a proposed Order of Dismissal within 30 days. Unfortunately, the parties now disagree as to whether an enforceable settlement agreement was ever reached.

According to Myers, the parties entered into a binding agreement in which Defendants would pay her $160,000 in exchange for the release of her claims. Defendants argue that no binding agreement existed when the Court entered its memorandum opinion and judgment on June 18. On this basis, Defendants offered a new settlement proposal of $40,000. Thereafter, Myers filed a motion to enforce the purported agreement for the sum of $160,000 [D. 123]. Defendants filed a response in opposition [D. 127], denying the parties ever reached an enforceable agreement. Myers replied [D. 129], and this motion is now ripe for adjudication.

For the reasons that follow, Myers's motion to enforce the settlement agreement is **DENIED**, and the Court will refile the previously withdrawn Memorandum Opinion and Judgment, granting Defendants' motions for summary judgment and dismissing this case with prejudice.

TABLE OF CONTENTS

I.   APPLICABLE LAW..................................................................................................... 4

   A.  Policy of Enforcing Settlements ................................................................. 4

   B.  Contract Law .............................................................................................. 4

      i.   Meeting of the Minds............................................................................ 4

      ii.  Definiteness & Materiality.................................................................... 5

      iii. Preliminary Negotiations & Settlement Releases ................................ 6

II.  BACKGROUND ...................................................................................................... 7

   A.  Price Negotiations: March 23 – May 24 .................................................... 7

   B.  "We're Good to Go...": May 25 – June 1 .................................................. 9

   C.  The Redline Drafts: June 11 – June 18 .................................................... 10

   D.  Court Order & The Aftermath: June 18 – Present ................................... 12

III. DISCUSSION ....................................................................................................... 14

   A.  May 29: Preliminary Negotiation or Agreement? ................................... 14

      i.   Mirror Image Rule .............................................................................. 14

      ii.  Purported Agreement in Principle ...................................................... 16

      iii. Acceptance by Conduct ...................................................................... 19

   B.  June 18: Agreement on Material Terms................................................... 19

      a.  Allocation of Proceeds........................................................................ 20

      b.  Allocation of Court Costs ................................................................... 23

      c.  Scope of Non-Disparagement............................................................. 23

      d.  Severability ......................................................................................... 25

   C.  June 18: Attempted Acceptance.............................................................. 27

IV.  CONCLUSION ..................................................................................................... 28

# I. APPLICABLE LAW

## A. Policy of Enforcing Settlements

Public policy strongly favors settlement of disputes without litigation. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). A federal district court may enforce agreements to settle and should uphold settlements when equitable and policy considerations allow, even when the agreement is oral or made off the record. *Kukla v. Nat'l Distillers Product Co.*, 483 F.2d 619, 621 (6th Cir. 1973); *RE/MAX Int'l, Inc. v. Realty One, Inc.* 271 F.3d 633, 646 (6th Cir. 2001).

This policy presupposes the settlement is a valid and enforceable contract. Thus, a court must first conclude that the parties reached agreement on all material terms. *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988). State law—in this case, Tennessee law—governs questions of formation, construction, and enforceability. *Montano v. Knox County*, No. 3:14-CV-404, 2016 WL 1192673, at *2 (E.D. Tenn Mar. 28, 2016); *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 385 (Tenn. 1996). The court decides issues of both fact and law. *Brown v. Cty. of Genesee*, 872 F.2d 169, 174 (6th Cir. 1989).

## B. Contract Law

In Tennessee, it is "well established" that while a contract can be expressed, implied, written, or oral, in order to be enforced it must result from a "meeting of the minds," and its terms must be sufficiently definite. *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990) (citing *Johnson v. Cent. Nat. Ins. Co. of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1962)).

### i. Meeting of the Minds

A "meeting of the minds" is synonymous with the phrase "mutual assent"—quite simply, one party must accept the other's offer. *See* Steven W. Feldman, *Tennessee Practice: Contract*

*Law and Practice* § 4:32, Westlaw (June 2018 update). The court may only look to the objective manifestations of the parties to determine if they have reached a meeting of the minds. *See* Restatement (Second) of Contracts § 17(c); *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). Ultimately, "the interpretation given by the parties themselves to the contract *as shown by their acts* will be adopted by the court." *Scandlyn v. McDill Columbus Corp.*, 895 S.W. 2d 342, 345 (Tenn. Ct. App. 1994) (cleaned up) (emphasis added).

Tennessee uses the "mirror image" rule to determine if the parties have come to a meeting of the minds, and under that rule, an acceptance that does not match the terms of the offer will not form a contract. *Starr Printing Co., Inc. v. Air Jamaica*, 45 F. Supp. 2d 625, 630 (W.D. Tenn. 1999) (citing *Canton Cotton Mills v. Bowman Overall Co.*, 257 S.W. 398 (Tenn. 1924)). When acceptance varies from the terms offered, the purported acceptance is in fact a counter-offer that rejects the original and initiates a new offer. *Westfall v. Brentwood Serv. Grp.*, No. E2000-1086-COA-R3-CV, 2000 WL 1721659, at *5 (Tenn. Ct. App. 2000) (citing *Tullahoma Concrete Pipe Co. v. T.E. Gillespie Constr. Co.*, 405 S.W. 657, 665 (Tenn. Ct. App. 1966)). A conditional acceptance is considered a counter-offer and will not bind the initial offeror, unless he or she manifests intent to be bound by a conditional acceptance. *Safeco Ins. Co. of America v. City of White House, Tenn.*, 36 F.3d 540, 546 (6th Cir. 1994) (citing *Lexington Hous. Auth. v. Cont'l Cas. Co.*, 210 F. Supp. 732, 735 (W.D. Tenn. 1962)); *see also* Restatement, *supra* § 59.

### ii. Definiteness & Materiality

The essential terms of the contract must also be "reasonably certain," meaning they provide a basis for determining the existence of a breach and an appropriate remedy. It is less likely that a reasonably certain term will be supplied for a matter which is the subject of controversy between the parties. *Jamestowne*, 807 S.W.2d at 564; *see* Restatement, *supra* § 33(a) ("If the essential terms

are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.")

The definition of an "essential" or "material" term is elusive, and the parties' behavior often provides the best guidepost for determining whether a particular term is material. *See* Restatement, *supra* § 33(b) ("Courts decide the disputes before them, not other hypothetical disputes which might have arisen.") Often, the materiality is proportional to the intensity of the parties' disagreement over that term. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 420 (6th Cir. 2000) ("[R]easonable differences in interpretation manifested themselves in heated debate during the drafting process, a situation that highlights the disagreement between the parties and the obvious materiality of the disputed terms.")

### iii.    Preliminary Negotiations & Settlement Releases

A contract may be formed even if parties obligate themselves to subsequently memorialize the agreement, so long as the parties have agreed to the terms they plan to incorporate into the final writing and have "definitely" agreed that the final writing will contain those terms and no others. Restatement, *supra* § 27(a). Tennessee law makes clear that "agreement shall have been expressed on *all* essential terms that are to be incorporated in the document." *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 23 (6th Cir. 2003) (quoting *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 17 (Tenn. Ct. App. 1997)) (emphasis added). But if either party knows or has reason to know the other party regards the agreement as incomplete until other terms are assented to, no contract has been formed. *EnGenius*, 971 S.W. 2d at 17 (adopting Restatement, *supra* § 27).

To determine if the parties intended for the later writing to memorialize their agreement, a court may consider context and how parties in similar situations have behaved. Restatement, *supra* § 27. Settlement agreements may be enforced even when the wording of a release has not been

6

finalized, and the precise terms and specific language of a release are not necessarily material. *See, e.g.*, *In re Deepwater Horizon*, 786 F.3d 344, 357 (5th Cir. 2015). But the facts of the case control, and the decision to construe a later document as a memorialization, rather than part of the agreement, depends on the parties' objective manifestations. Indeed, courts will refuse to enforce settlements when the release or final written settlement agreement is all that remains. *See, e.g.*, *Brockwell v. Beechwood City School Dist.*, No. 1:04-CV-1155, 2008 WL 918266 at *8 (N.D. Ohio Mar. 31, 2008) (court refused to enforce settlement even after parties filed order of case dismissal because they had not agreed on material terms in settlement agreement); *Rachford v. Air Line Pilots Ass'n Int'l*, 375 F. Supp. 2d 908, 938 (N.D. Cal. 2005) (refusing to enforce settlement because parties could not agree on scope of waiver and release); *Nascimento v. Wells Fargo Bank, NA*, No. 2:11-CV-1049, 2013 WL 6579575 at *3 (D. Nev. Dec. 13, 2013) (no settlement agreement was formed after defendant sent four letters containing different release terms from plaintiff's offer).

## II. BACKGROUND

The parties do not dispute the relevant facts in this case—only their legal significance. Thus, no evidentiary hearing is required. *Aro Corp.*, 531 F.2d at 1372. The facts are as follows.

### A. Price Negotiations: March 23 – May 24

The parties participated in an unsuccessful mediation on March 23, 2018 [D. 125, Colbert Aff., ¶ 3]. At the close of mediation, Defendants made an offer to settle for $50,000, inclusive of attorneys' fees and exclusive of reinstatement; Plaintiff responded with an offer of $190,000 [*Id.*]. The parties filed a status report on April 9 informing the Court they had not reached agreement [D. 111], so the Court lifted the stay and rescheduled the trial [Colbert Aff., ¶ 4; D. 112]. Plaintiff responded to Defendants' motions for summary judgment on April 30 [Colbert Aff., ¶ 4; D. 113].

On April 4, the attorneys met in Nashville. Chris McCarty, attorney for Defendants, solicited Plaintiff's best settlement demand, saying he could "only go to the well once" [Colbert Aff., ¶ 6]. Plaintiff's attorneys made a strategic decision not to bid, even after Mr. McCarty sent a follow-up e-mail on April 20 [Colbert Aff., ¶ 7; D. 125-1].

Over the next four weeks, the parties inched toward an agreed settlement price. Mr. McCarty sent a new offer of $75,000 on April 27, and Plaintiff reduced her demand to $180,000 [D. 125, 3-4]. On May 8, Mr. McCarty offered $100,000, saying the amount represented the "full extent" of his settlement authority [D. 125-5]. The attorneys then spoke by phone, and Mr. McCarty requested a counter, upon which Plaintiff's attorney Richard Colbert said his client would settle for $160,000, the lower limit of his authority in mediation [Colbert Aff., ¶ 8].

On May 18, Mr. McCarty said he had authority to offer $125,000, but for that price, Plaintiff would have to agree to a full release and a waiver of any reinstatement rights [D. 125-6]. Mr. Colbert replied by e-mail four days later, and wrote "you asked for my best shot, and I gave it to you at $160k." [*Id.*] On May 24, Mr. McCarty replied as follows:

> Good evening, Rick,
>
> Looks like we have a deal. As of tonight, I have authority to offer $160,000, inclusive of all fees, damages, costs, etc. We will need to formalize, but others [sic] terms I will need include:
>
> -Mutual non-disclosure, with the understanding that the Agreement itself would still be subject to Open Records Act requests;
> -Mutual non-disparagement;
> -Waiver of any re-employment right and reinstatement; and
> -No admission of wrong-doing on the part of both Defendants.
>
> Please let me know if you can still confirm we have a deal at $160,000, and we can send you a formal Release to review soon.
>
> Thanks,
> Chris [D.125-7]

### B. "We're Good to Go...": May 25 – June 1

In response to Mr. McCarty's e-mail, Mr. Colbert said he would have to check with a few people to "make sure we still have a deal," but that he "[did no]t foresee a problem" [D. 125-7]. A few days passed in silence; with no response from Mr. Colbert, Mr. McCarty reached out on May 29, to see if they were "good to go" [*Id.*]. An hour-and-a-half later, Mr. Colbert replied by e-mail:

> We're good to go, assuming there are no glitches in the Agreement and Release. The Agreement and Release should include (some of these you already suggested):
>
> 1.    $160,000 settlement broken into two separate checks, one to Myers for compensatory damages and one to our firm for reimbursement of attorney's fees and expenses. I'll give you the breakdown later today or tomorrow.
> 2.    Confirmation from you that all copies of Myers' drug test results have been removed from all school system files. We understand that you may retain a copy in your litigation file; but since it contains personally identifiable medical information about her, it should not be treated as a public record under any circumstance.
> 3.    Mutual non-disparagement commitments.
> 4.    Commitment to a neutral employment reference.
> 5.    No admission of wrongdoing.
> 6.    Confidentiality to the extent permitted by law. Exception for Myers to disclose to family member, attorneys, and financial advisors. Only copy of Agreement and Release should be maintained in your litigation file, subject to disclosure if properly requested under the Public Records Act, but otherwise not disclosed; and in no event shall disclosure be accompanied by any commentary by school system officials.
> 7.    Waiver by Myers of reemployment rights and agreement not to seek employment.
>
> Richard L. Colbert [*Id.*]

Mr. McCarty said Defendants were "good to go except for one issue," regarding the broad scope of the proposed confidentiality exception for "family members." Continuing, he wrote, "[t]his was a specific and important term for my client, thus I want to make sure we stick with it." Mr. Colbert said it "seem[ed] unrealistic" to expect Plaintiff not to share details of the settlement with her parents and son, and that Defendants should not be "too restrictive" [*Id.*].

Mr. McCarty followed up: "Is Ms. Myers really willing to say 'no deal' based on not being able to tell her parents/children?" Mr. Colbert replied: "If you're really willing to say 'no deal' unless she agrees that she can't tell the only close family members she has about the result of this major life event, then I suppose it will be 'no deal.'"

The attorneys compromised. If Mr. Colbert could provide the names of family members to whom Plaintiff would like to disclose the settlement terms, the attorneys could identify those family members in the agreement and have them sign separate non-disclosures. At that point, Mr. McCarty said they would "likely" have a deal [*Id.*].

On June 1, Mr. McCarty sent Plaintiff's attorneys a "DRAFT Release of All Claims" and a "DRAFT Non-Disclosure Agreement." He left the monetary amounts blank, other than the grand total of $160,000 [D. 125-8]. He also sought Mr. Colbert's input regarding the appropriate distribution of the settlement as to "taxable and non-taxable," suggesting it is "wise/advisable to go 50-50" but welcoming other thoughts [*Id.*]. Mr. Colbert said he would review the drafts and cancel a deposition scheduled for June 4 [D. 125-9]. The parties did not speak again until June 11.

### C. The Redline Drafts: June 11 – June 18

On June 11, Plaintiff's attorney Nina Eiler sent Mr. McCarty a "redline" version of the Release. Plaintiff accepted the Non-Disclosure Agreement as written [D. 125-9]. In the redline version, plaintiff's attorneys made these substantive changes to Defendants' draft release:

#### a. Paragraph 1: Monetary Consideration

Defendants had provided for a gross settlement amount of $160,000, but did not specify how the money should be distributed between attorney's fees, economic damages (reported to the IRS on Form W-2), and non-economic damages (reported on Form 1099-MISC) [D. 125-8]. Plaintiff filled in the blanks, applying $100,000 toward attorney fees, and the remaining $60,000 toward non-economic damages [D. 125-9].

#### b. Paragraph 6: Outstanding Suit

Plaintiff added a line: "Defendants shall be responsible for any court costs" [*Id.*].

### c. Paragraph 9: Non-Admission

Defendants' version had a provision to protect only themselves, saying they did not admit any facts, allegations or claims set forth in the suit, and denied violating any state or federal laws. Plaintiff added a similar provision, not admitting to "any adverse allegations about Plaintiff made by Defendants at any point during the Suit" [*Id.*].

### d. Paragraph 10: Non-Disclosure

Plaintiff added a line, saying that Defendants' non-disclosure obligations "shall be binding upon the Defendants themselves and their agents and employees" [*Id.*].

### e. Paragraph 11: Non-Disparagement

Plaintiff added the following: "The Defendants will not provide any negative or disparaging information or opinion regarding the Plaintiff. The Defendants' obligations herein shall be binding upon the Defendants themselves and their agents and employees" [*Id.*].

### f. Paragraph 12: Taxation

Plaintiff struck: "Plaintiff also agrees to indemnify Defendants as to any claims, demands, penalties, and the like levied against Defendants by the Internal Revenue Service (or a similar agency) related in any way to the amounts Plaintiffs received pursuant to this Release" [*Id.*].

### g. Paragraph 17: Severability

Plaintiff struck all of Paragraph 17, which read: "Should any provision of this Release be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby, and said illegal or invalid part, term or provision shall be deemed not to be part of this Release" [*Id.*].

On Friday, June 15, and Monday, June 18, the parties argued over four provisions in the redline draft: i) the allocation of proceeds in Paragraph 1, in conjunction with Paragraph 12's eliminated indemnification clause; ii) the court costs provision in Paragraph 6; iii) the scope of the non-disparagement clause in Paragraph 11, and iv) the elimination of the severability clause in Paragraph 17 [D. 125-10, 11]. Aside from those issues, Defendants accepted all changes made in the redline draft.

### D. Court Order & The Aftermath: June 18 – Present

At 2:42 PM EDT on June 18, Mr. Colbert e-mailed Mr. McCarty with comments on the four sections still in dispute [D. 128-7]. This was the last e-mail exchanged between the parties before this Court entered a Memorandum Opinion at 4:15 PM EDT, and Judgment at 4:19 PM EDT, granting Defendants' motions for summary judgment and dismissing the case with prejudice [D. 128-8, 9]. Within ten minutes, Mr. McCarty sent an e-mail to Mr. Colbert, telling him "[i]n light of the Court's recent Memo and Judgment, I will have to be back with you soon as to our position on your comments below and the status of this case in general" [D. 128-10]. Only one minute later, Mr. Colbert sent Mr. McCarty an e-mail, as follows:

> I'm sure you received the order and memo Judge Reeves just entered. I called Pam Simpson [Judicial Assistant to Judge Reeves] just now and apologized for neither of us letting the Court know that we had reached a settlement agreement and were finalizing the details of the paper. They are going to talk tomorrow about what they can do (presumably an order that rescinds the one entered today) so we can wrap up the settlement and submit a stipulation of dismissal with prejudice. They will let us know when they figure it out [D. 128-11].

At 4:55 PM EDT, Pam Simpson e-mailed attorneys for both parties, confirming her conversation with Mr. Colbert, who told her the parties had been in settlement negotiations for the past couple of weeks. She also discussed a phone call from Mr. McCarty, who confirmed the parties had been negotiating, but that "the parties had not yet reached a final settlement." The Court rescinded its orders, instructing the parties to proceed with settlement negotiations and to submit a proposed order of dismissal within the next 30 days [D. 128-12].

At 5:16 PM EDT, Mr. Colbert wrote to Mr. McCarty: "Just to be clear, if you're not convinced by any of my comments below, we will accept the version you sent that we made our redline suggestions on, with the agreed dollar amounts inserted." Nine minutes later, Mr. McCarty replied:

> I am afraid it is too late for that, Rick. I sent you an email earlier that said:
>
> **"In light of the Court's recent Memo and Judgment, I will have to be back with you soon as to our position on your comments below and the status of the case in general."**
>
> You had already specifically rejected my last notes/concerns with your comments below. In fact, you even set forth new numbers and substantive issues when rejecting. Further, you had already previously rejected the only version of the Release that I e-mailed on June 1st by sending your own redline version on June 11th.
>
> I believe I will be sending back a settlement offer soon with new terms and new numbers, but I will first need to confirm the same with my client.
>
> Thanks,
>
> Chris [D. 128-13]

The next day, June 19, Mr. McCarty e-mailed a new settlement offer:

> Dear Rick:
>
> As promised, enclosed you will find a new settlement offer with new terms in light of what occurred yesterday. As you stated in a May 29th e-mail to me, "We're good to go, assuming there are no glitches in the Agreement and Release." Well, there certainly were "glitches," as we were still not in agreement on substantive terms/changes when the court's ruling was released.
>
> Given the substance of that ruling and the language used in the Court's Memorandum, we feel strongly about our case. The Court, as you know even quickly dismissed the argument you have brought up again and again regarding contacting Ms. Myers' physician. So, with all of that, please take a look at the enclosed Release and let me know if we have a deal. Please know this is not an offer to negotiate [FN: There is one exception here as it is up to you where the money actually goes under Section No. 1]. The deal being offered is the only deal, thus just let us know if Ms. Myers takes it or leaves it. But my client is not going backward after we all read what the court wrote.
>
> Sincerely yours,
>
> [/s]
>
> Chris McCarty [D. 124-18]

The parties have not communicated since that e-mail [Colbert Aff. ¶ 21]. Eight days later, Plaintiff filed her motion to enforce the settlement agreement, now before the Court [D. 124].

## III. DISCUSSION

The Court must answer one simple legal question: Did the parties form a contract? If they did, then Plaintiff's motion to enforce the settlement will be granted. If they did not, the motion will be denied. The discussion focuses on three critical moments from the timeline: The end of the May 29 e-mail exchange (where Mr. Colbert said "[w]e're good to go...") [D. 125-7]; Mr. Colbert's final e-mail before the court entered its order [D. 128-7]; and Mr. Colbert's attempted acceptance after the order was entered [D. 125-12].

### A. May 29: Preliminary Negotiation or Agreement?

Plaintiff first argues that when the parties completed their May 29 e-mail exchange, settling the issue of non-disclosure to family members, they had an agreement [D. 124, p. 3; *see* D. 128-3]. She argues that any later disagreements occurred in the course of finalizing a writing to "memorialize" the settlement [D. 129, p. 4]. In the alternative, she suggests that conduct can be regarded as acceptance of an offer without doing damage to the mirror image rule, and that the conduct of these parties shows they understood an agreement had been reached [D. 129, p. 8].

#### i. Mirror Image Rule

The Court must first decide whether the parties reached agreement on May 29.

As discussed, an objective manifestation of mutual assent by both parties is a necessary, but not sufficient, condition for enforcing any agreement. *T.R. Mills Contractors, Inc.*, 93 S.W.3d at 865-66. Tennessee courts apply the mirror image rule—where the terms of acceptance must precisely match the terms of the offer—to determine if the parties have reached assent. *Starr Printing*, 45 F. Supp. 2d. at 630 (citing *Canton Cotton Mills*, 257 S.W. at 398). Under this rule, a conditional acceptance is considered a counter-offer and will not bind the offeror, unless the offeror

manifests that conditional acceptance is satisfactory. *Safeco Ins. Co. of America*, 36 F.3d at 546 (quoting *Lexington Hous. Auth.*, 210 F. Supp. at 735).

In her reply brief, Plaintiff suggests the mirror image rule is out of fashion, because it emanates from the *Canton Cotton Mills* case decided almost a century ago [D. 129, p. 8]. The rule of *Canton Cotton Mills* may be old law, but it is still good law in Tennessee. *See* Steven W. Feldman, *supra* § 4:32 (describing *Canton Cotton Mills* as the "leading" Tennessee Supreme Court case; under mirror image rule, "a purported acceptance will be ineffectual where it adds, qualifies or deletes terms.") The Court understands Chapter 2 of the Uniform Commercial Code abrogates the mirror image rule [*see* D. 128, p. 8]. But Chapter 2 of the UCC only governs contracts for the sales of goods, and it does not apply to this case. *See* Tenn. Code Ann. § 47-2-102 ("Unless the context otherwise requires, this chapter applies to transactions in goods").

Applying the mirror image rule to the undisputed e-mail record from May 29 [D. 125-7; D. 128-3], the Court finds the parties had not reached agreement on the essential terms. The exchange began with Mr. McCarty's proposal on May 24 (emphasis in bold):

> Good evening, Rick,
>
> **Looks like** we have a deal. As of tonight, I have authority to offer $160,000, inclusive of all fees, damages, costs, etc. We will **need to formalize**, but others [sic] **terms I will need** include:
>
> -Mutual non-disclosure, with the understanding that the Agreement itself would still be subject to Open Records Act requests;
> -Mutual non-disparagement;
> -Waiver of any re-employment right and reinstatement; and
> -No admission of wrong-doing on the part of both Defendants.
>
> Please let me know if you can still confirm we have a deal at $160,000, and we can send you a **formal Release to review** soon.
>
> Thanks,
> Chris [D.125-7]

Formally speaking, this e-mail was a response to Mr. Colbert's "best shot" offer of $160,000 on May 22. Because of the additional terms, Mr. McCarty's response is a rejection of that offer and a counter-offer under the mirror image rule. Mr. McCarty specifically mentions the Release in this offer, using the word "formalize," suggesting he may have viewed the release as a memorialization. Restatement, *supra* § 27(a). Even if he did, Mr. Colbert's response shows that he would not reach an agreement without first agreeing to the terms in the Release:

> We're good to go, **assuming there are no glitches in the Agreement and Release**. The Agreement and Release should include (some of these you already suggested):
>
> 1.  $160,000 settlement broken into two separate checks, one to Myers for compensatory damages and one to our firm for reimbursement of attorney's fees and expenses. I'll give you the breakdown later today or tomorrow.
> 2.  Confirmation from you that all copies of Myers' drug test results have been removed from all school system files. We understand that you may retain a copy in your litigation file; but since it contains personally identifiable medical information about her, it should not be treated as a public record under any circumstance.
> 3.  Mutual non-disparagement commitments.
> 4.  Commitment to a neutral employment reference.
> 5.  No admission of wrongdoing.
> 6.  Confidentiality to the extent permitted by law. Exception for Myers to disclose to family member, attorneys, and financial advisors. Only copy of Agreement and Release should be maintained in your litigation file, subject to disclosure if properly requested under the Public Records Act, but otherwise not disclosed; and in no event shall disclosure be accompanied by any commentary by school system officials.
> 7.  Waiver by Myers of reemployment rights and agreement not to seek employment.
>
> Richard L. Colbert [*Id.* (emphasis added)]

Mr. Colbert says they were "good to go," *assuming* there were no "glitches" in the Agreement and Release. In other words, *if* the Agreement and Release were "glitch"-free, *then* Plaintiff would accept the offer. Plaintiff, through Mr. Colbert, only conditionally accepted Defendants' offer, and a conditional acceptance does not form a binding contract under the mirror image rule.

### ii. Purported Agreement in Principle

Nonetheless, Plaintiff still argues that the parties understood the Agreement and Release would simply memorialize the "agreement in principle" they reached on May 29.

As explained above, if either party knows or has reason to know the other party regards the agreement as incomplete until other terms are assented to, no contract has been formed; the facts of the case will illustrate whether the parties view the subsequent writing as a part of the agreement, or a formal reckoning of terms previously agreed to. Unfortunately for Plaintiff, the same phrase that makes acceptance invalid under the mirror image rule—"assuming there are no glitches"— also suggests she did not consider the agreement complete until the parties mutually assented to the terms of the release

In her brief, Plaintiff pointed the Court to a litany of Tennessee state and federal cases where courts enforced settlements in the absence of a writing or formal agreement [D. 124, pp. 6-9]. The Court read these cases, in particular *Harvey v. Turner*, No. M2014-368, 2015 Tenn. App. LEXIS 154 (Tenn. Ct. App. Mar. 26, 2015). According to Plaintiff, that case "rejected the theory that the agreement in principle was simply an unenforceable agreement to agree and that the formal written settlement agreement was necessary to create a binding agreement" [D. 124, p. 9].

Even if *Harvey* did reject the theory that a later written agreement would be necessary to create a binding agreement (which may never have been in doubt), it does not follow that a later written settlement agreement is *unnecessary* to create a binding agreement. In fact, the *Harvey* opinion is less sweeping and more equivocal than Plaintiff would have this Court believe:

> What is an agreement in principle? It appears that Tennessee courts have not yet defined the term. Other courts have adopted conflicting definitions. For example, it has been said that "[w]hen business people use [the term] 'agreement in principle,' it means that the parties have reached a meeting of the minds with only details left to be resolved." On the other hand, the Sixth Circuit Court of Appeals "has indicated that the term signifies a preliminary agreement, and not a final, binding contract." Given the different interpretations of the term, it offers us no assistance in determining the intent of the parties.

> *Harvey*, 2015 Tenn. App. LEXIS at *10 (citations omitted).

So it bears repeating—the facts of the case control. And the facts in *Harvey* contrast neatly with the facts here. In that case, which emerged from a property boundary dispute, the attorneys

announced in open court they had reached "agreement in principle," and that a "more formal" settlement agreement containing the "essential terms" would be executed. *Id.* at 9. They recited those terms, in open court. *Id.* After the recitation, the attorneys were asked if they "both agree that's what your clients have agreed to?"—and the attorneys said yes. *Id.* The later enforcement dispute only arose because a party wanted a sewer line to run to his property, claiming the issue should have been addressed in the settlement (yet his attorney admitted the sewer line was not part of the claims in the lawsuit). *Id.* at 12-13.

No conclusive rule of law can be extrapolated from the many cases discussing situations where a later release or formal agreement was contemplated. Instead, the Court must follow the cardinal rule of contract interpretation: What did the parties intend? *See e.g., Hemlock Semiconductor, LLC v. Summit Process Design, Inc.*, No. 3:15-CV-664, 2016 WL 2595263 at *2 (M.D. Tenn. May 5, 2016) (finding enforceable agreement where parties agreed, on the record, that memorandum of understanding was "intended to be a memorialization that captures the parties' intent") (quotation marks in original).

The vigorous and complete assent to the agreement's essential terms by both sides in *Harvey* appears nowhere in this record. The Court is hesitant to rely so heavily on the phrase "assuming there are no glitches," but in the absence of any evidence contradicting the phrase's plain meaning, the Court cannot find that Plaintiff viewed the Release as a mere formality. *See* Restatement, *supra* § 202(3)(a) ("Unless a different intention is manifested, where language has a generally prevailing meaning, it is interpreted in accordance with that meaning.") Mr. McCarty, the Defendants' attorney, also hedged on May 29, saying they "likely" had a deal after coming to agreement on the scope of the "family members" exception [D. 128-3].

Therefore, because at least one party viewed the release as a necessary to the overall agreement, the Court cannot conclude the parties definitely understood the May 29 agreement as completely expressing the essential terms of the overall settlement.

### iii. Acceptance by Conduct

An offer may be accepted by conduct without damaging the mirror image rule. *Gurley v. King*, 183 S.W. 3d 30, 41 (Tenn. Ct. App. 2005) ("Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed") (quoting Restatement, *supra* § 34(2)); *Starr Printing*, 45 F. Supp. 2d at 631.

But the Court can only find acceptance by conduct from evidence in the record. On May 25, Mr. Colbert told a potential expert witness in the case it "appeared" they were settling, and after that, Mr. Colbert did no more work with the expert witness [Colbert Aff. ¶ 11]. A deposition, scheduled for June 4, was also cancelled on or around June 1 [Colbert Aff. ¶ 14]. While discontinuing witness preparation is the sort of conduct consistent with acceptance, it is certainly not dispositive of acceptance. The parties engaged in no other conduct to suggest they had reached an agreement,[1] and the Court thus finds insufficient evidence of acceptance by conduct.

Accordingly, the court finds the parties did not form a contract on May 29 through a meeting of the minds, that the parties viewed the terms of the Agreement and Release as necessary to the overall agreement, and that the conduct of the parties does not indicate acceptance.

### B. June 18: Agreement on Material Terms

The undisputed evidence shows the parties were still discussing the following four provisions of the Draft Agreement and Release when the Court entered its order on June 18:

- Allocation of settlement proceeds between wages and non-economic damages, and the related indemnity clause

---

[1] For examples, the parties might have communicated with the Court, to prevent it from ruling on any pending dispositive motions in the midst of negotiations.

- Allocation of court costs
- Application of the non-disparagement clause to Defendants' agents and employees
- The severability clause

A court may only enforce an agreement if the material terms of the agreement are sufficiently definite; here, the parties disagree over whether the above terms are "material." If the disagreement over all four terms was purely non-material, the Court may find the parties had entered into an enforceable agreement, even if it finds the terms were not definite. But if any provision was both material to the agreement, and in dispute, the agreement cannot be enforced.

The e-mail sent from Mr. Colbert to Mr. McCarty at 2:42 PM on June 18, containing the full back and forth between the attorneys, will frame the discussion [D. 128-7]. All comments in bold are those made by Mr. Colbert (representing Plaintiff) in response to issues raised by Mr. McCarty (representing Defendants) on Plaintiff's redline draft.

### a. Allocation of Proceeds

The first issue left unsettled on the afternoon of June 18 was the question of how to apportion the settlement proceeds for tax purposes.

- Sections 1(a)-(b) and Section 12: Please help me here. I know you both handle a lot of employment cases as well, and I cannot recall an employment-related settlement in which someone tried to argue that all disputed damages could be listed as non-economic. Ms. Myers was certainly claiming lost wages, thus I believe some portion of her recovery needs to be shown as lost wages under Subsection 1(a). If we went with your 100% non-economic suggestion though, then we would at least need to re-insert the indemnification language you deleted from Section 12. If we place some degree of damages in the wages column, then I have no issue deleting that indemnification language. **Not sure why this matters to you. It will actually save your client some money (no employer contribution to TCRS[2], no employer share of FICA). In any event, we left it to her. She talked with her accountant son, and this is what they suggested. She has to pay income taxes on it either way since the damages are not for physical injury, and that's covered in Section 12. If the IRS says some of it must be treated as wages and charges employer and employee FICA taxes, then what your client will be liable for will be no different than what it would be liable for if we made that determination now, so the indemnification language is not needed.**

---

[2] The Tennessee Consolidated Retirement System, a qualified pension plan under U.S. Internal Revenue Code § 401(a). *See* Tenn. Dep't of Treasury, *Tennessee Consolidated Retirement System*, http://www.treasury.state.tn.us/tcrs/Taxes-on-Bene.html.

o   As an outside of the box idea, Ms. Myers accountant son wants to provide a signed/written opinion as to why he thinks all of her recovery can be listed via a 1099, we would be happy to rely on it. **Not going to do that. I would not suggest to him that he subject himself to some sort of claim by your client, and I don't think he'd accept that suggestion if I made it** [D. 128-7].

According to Plaintiff, the allocation of damages in the settlement would not affect Plaintiff's income tax obligation because compensatory damages for non-physical injuries are taxable income under 26 U.S.C. § 104(a)(2) [D. 128-7; D. 124, p. 10, n. 6]. Plaintiff is correct about § 104(a)(2) as it applies to Plaintiff's income taxes but ignores in her brief how the choice of allocation affects whether Plaintiff and Defendants would owe payroll taxes under FICA and TCRS.[3]

Mr. Colbert appears to understand this, telling Mr. McCarty in the e-mail that Defendants would "save" money by allocating the entire payout to damages instead of lost wages [D. 128-7]. He is superficially correct, but oddly ignores—or feigns ignorance of—the reason for Defendants' concern. Any employer could "save" money if they avoided payroll taxes. Responsible employers refrain from doing so, of course, because avoiding payroll taxes when they are owed, including in settlement agreements, is illegal. If audited, the parties could be subjected to additional penalties above what they would have originally paid. *See generally* Internal Revenue Service, *Lawsuits, Awards, and Settlements Audit Techniques Guide* ch. 5 (May 2011)[4] (discussing auditing procedures and potential statutory penalties for improperly reported lawsuit settlements).

Even so, a case from another jurisdiction does lend support to Plaintiff's argument that tax allocation should not be considered a material term in a settlement agreement. *See Demissie v.*

---

[3] The implications are slightly different for each party. For Plaintiff, she would still receive $60,000 in gross income, but the net receipt would be lower (although she would be compensated in part with more substantial retirement benefits later on). For Defendant, the FICA and TCRS payments are not withholdings, but extra costs paid above the gross settlement amount.

[4] Available at https://taxmap.irs.gov/taxmap/ts0/lawsuitsawardsands_o_55a09abf.htm.

*Starbucks Corp. Office & Headq'rs*, 118 F. Supp. 3d 29, 35-37 (D.D.C. 2015). The court in *Demissie* (applying binding caselaw in that district) described tax allocation as "ministerial, relating more to the administration of the settlement than to the agreement itself." *Id.* (citation omitted). The court decided that, because the allocation did not change the parties' obligation to perform and the amount of money at stake was small, the tax allocation provision was not material.[5] *Id.* Although the case is not binding, this Court finds *Demissie*'s reasoning persuasive. If allocation was in fact the only issue at stake, the Court might find this provision is non-material.

Here, Defendants were clearly concerned about achieving up-front "savings" by knowingly allocating all $60,000 owed to Plaintiff as non-economic damages in a case where Plaintiff sought economic damages, such lost wages, back pay, and employee benefits as redress for her claims [D. 39 ¶ 32-3, -4A]. If the parties did allocate all $60,000 towards non-economic damages, Defendants wanted a safety net—an indemnity clause or accountant certification—should their fears of later scrutiny come true.

This case is thus distinguishable from *Demissie*. Defendants' central concern was not with how the taxes were allocated. The dispute concerned both the allocation clause (Paragraph 1) and the indemnity clause (Paragraph 12). Defendants were willing to agree to Plaintiff's proposed allocation but required a safety valve in case the IRS or another agency concluded the unorthodox allocation was in fact illegal. Mr. McCarty proposed two potential bargains for Mr. Colbert. Under the first proposal, Defendants would agree to allocate all $60,000 to non-economic damages, so long as Plaintiff re-inserted the indemnification language protecting Defendant against any future

---

[5] One contrast is that in *Demissie*, the allocation issue came up after the parties "reached agreement and shook hands." *Demissie*, 118 F. Supp. 3d at 36. This Court has found there was no agreement prior to the allocation issue being raised. III.A, *supra*. Also in *Demissie*, the tax issue was not the "true bone of contention." *Id.* The record in that case suggested Plaintiff may have been looking to escape the settlement agreement because of its effect on a related worker's compensation case. *Id.* On this record, neither party appears to be acting with an ulterior motive.

prosecution by the IRS or other agency. Alternatively, Plantiff's son—an accountant who proposed allocating all $60,000 to non-economic damages—could certify his professional opinion in writing. In either case, Defendants made it clear they needed protection in case issues arose later.

Mr. Colbert's final response gives no hint he is willing to budge, so the Court cannot find a definite term to enforce. Defendants' also viewed future tax liability they might face in the absence of indemnification or accountant's certification as important. Thus, the court also finds the allocation term was material to the agreement.

### b. Allocation of Court Costs

- Section 6: There are no court costs in federal court. **We understand that the district court clerk does not tax costs the way state trial court clerks do. However, there is an initial filing fee that must be paid when a case is commenced in federal court, and we believe your client should reimburse that fee (just as we would expect your client to pay court costs). That's why I left Nina's court cost addition in the redline. In addition, we need to add a provision here requiring your client to pay any outstanding fees to still owed to the mediator** [D. 128-7].

The Court finds no evidence in this portion of the e-mail or in any other piece of evidence providing a definite allocation of court costs between the parties. But the Court also finds that payment of the filing fee and mediation costs is unrelated to the underlying purpose of the settlement agreement. Outside of this e-mail, court costs were never mentioned, and the mediation costs were raised in passing one time. No principled disagreement between the parties is evident, and neither party appeared to consider the cost provision essential.

Thus, the Court finds that the court cost provision is not a material term. The parties' failure to agree on this term will not affect whether the Court enforces the purported settlement agreement.

### c. Scope of Non-Disparagement

- Section 11: This line presents a practical issue: "The Defendants' obligations herein shall be binding upon the Defendants themselves and their agents and employees." As you both know, this Agreement will not be shared or distributed to all the system's agents/employees. And this is a system that employs Ms. Myers' ex-husband. As written, the foregoing new line could present a breach situation even if Ms. Myers' ex-husband disparaged her to their adult children. We just cannot account and vouch for ever [sic] system employee here.

I have no problem with your other new line, but this one must go. **We have a problem with removing that provision. You have already been very particular about Ms. Myers' compliance with the non-disclosure provision, even though the Agreement will technically be a public record so that the non-disclosure obligation does not have the same force and effect on your client that it does on mine. In addition, I can't help but believe there are some agents of the Defendants, like Mr. Ripley, who know about the terms of the Agreement. So the non-disparagement provision is really much more important to us than the non-disclosure provision. I agree that it might be too much to expect management to prevent proper disparagement of Ms. Myers by rank-and-file employees. But I think it is fair to expect management to direct management personnel to avoid such disparagement of Ms. Myers. I believe Ms. Myers' ex-husband may be management personnel. If so, you could carve out some sort of exception that would not penalize the school system if he should make disparaging remarks about her to their children, so long as those disparaging remarks to [sic] pertain to anything that is related to her work for the school system** [D. 128-7].

Both parties clearly considered this provision important. Mr. McCarty writes "this one must go." For Mr. Colbert, the non-disparagement language is "more important" to his client than the non-disclosure provision that almost scuttled the deal on May 29 [D. 125-7].

Plaintiff emphasizes that Defendants' original draft release included agents and employees in the general definition for "Defendants" [D. 124, p. 10 n. 7; D. 129, pp. 5-6]. Because the original draft contained this general clause, she argues this made Mr. Colbert's proposed extension of the non-disparagement provision to Defendants' agents and employees "duplicative," and Defendants' objection to the extension "meaningless" [D. 129, p. 6].

But in the draft they sent, Defendants did not impose a non-disparagement obligation on themselves [D. 125-8, p. 5]. Thus, the Court cannot infer that Defendants' intended the general definition from the previous draft to operate with respect to new obligations added in a later draft. When Mr. Colbert sent the redline draft, which added a new obligation, Defendants immediately responded with concerns about their potential liability under the scope of the new obligation.[6]

---

[6] The Court notes both parties agreed to "mutual" non-disparagement obligations in their May 29 e-mail [D. 128-7], so it is strange that Defendants' draft release did not contain that provision. But whether that was intentional or was an oversight, nothing in the record suggests the parties had reached a meeting of the minds on the *scope* of this non-disparagement provision.

Mr. Colbert does propose a compromise at the end of his e-mail, and Defendant very well may have agreed to it in reply. Alas, that is not what happened. From the record before it, a court could not clearly enforce the non-disparagement clause should a dispute arise. As the strong language from the e-mails ("must go," "more important") shows, both parties considered this an important, and therefore material, term.

### d. Severability

- <u>Section 17</u>: Severability is standard, but also important. Without it, a court could arguably strike Section 11 and then we are stuck with no release under Section 2. If you have suggested changes to this Section, I will be happy to take a look. But some form of severability clause remain in the agreement [sic]. **The entire agreement is what the parties bargained for. There is give and take throughout; and if one portion is struck, then one party or the other doesn't get everything he/she bargained for. With that said, if severability is essential to you, then I would suggest a modified provision under which the provisions are severable with the exception of Sections 1 and 2; and if either of those two sections is determined to be unenforceable, then the entire agreement shall be void. Consider this:**
  - **"The provisions of Sections 1 and 2 of this Settlement Agreement are essential. In the event that any provisions of Section 1 or Section 2 are found to be unenforceable, then this entire Agreement shall be deemed unenforceable, void, and of no effect; and in such case, Myers may within 30 days refile the Suit, without objection by the Defendants on the basis of this Settlement Agreement or on a statute of limitations, provided Myers first returns the sums paid under Section 1. If Myers does not return the sums paid under Section 1, then the parties shall renegotiate a valid Agreement that cures whatever causes this Settlement Agreement to be declared void.**
  - **"Except for Sections 1 and 2 of this Agreement, the individual provisions of this Settlement Agreement are severable. If any severable provision is found to be unenforceable, in whole or in part, the remaining provisions and any partially enforceable provisions shall be binding and enforceable"** [D. 128-7].

Defendants succinctly describe the importance they attached to the severability provision in their brief. "The intent behind the inclusion of such language is clear, as Defendants wanted to ensure one problem provision did not render the entire prospective agreement invalid. Indeed, in the case of a settlement agreement, especially in an employment context, the necessity of a severability clause is magnified." [D. 127, p. 23]

In reply, Plaintiff writes that while "[s]everability provisions may be commonplace, []that does not mean they are always wise or even always given serious consideration before insertion as a matter of course in a document" [D. 129, p. 6 n. 5].

The Court is in the business of deciding cases, not writing treatises. Thus, it must decide whether this severability clause was essential to these parties, not whether severability clauses are useful or essential in a vacuum. Defendants' immediate concern is quite clear—Paragraph 2, under which Plaintiff would agree to release all claims, could be invalidated without a severability clause. In other words, if a court found any provision in the agreement invalid, Plaintiff could bring the same suit again. Defendants' made the need for a release clear during the price negotiation phase, when Mr. McCarty said he had authority from his client to offer $125,000 only if Plaintiff agreed to a "full" release [D. 125-6]. Since the Defendants' ultimately settled at $160,000, the Court finds no reason to infer Defendants attached less significance to the terms of the release at a $160,000 than they did at $125,000.

Defendants found the clause important because not including it would frustrate the purpose of the settlement; Plaintiff found the clause objectionable because the whole agreement is "what the parties had bargained for." Clearly, the clause meant something to both parties. Therefore, the Court finds the severability clause was material to the agreement.

In his final e-mail, Mr. Colbert does propose a compromise that Defendants may have accepted [D. 128-7]. But any conclusion that Defendants would have agreed to the compromise is speculative. Both parties had clearly stated preferences for and against a severability clause on June 18, and the Court finds they never reached a meeting of the minds over this term.

In sum, the Court finds three material terms in the Agreement and Release on June 18 were indefinite, rendering the agreement unenforceable at this stage.

### C. June 18: Attempted Acceptance

Shortly after the Court entered the Memorandum Opinion and Judgment on June 18, Mr. McCarty e-mailed Mr. Colbert: "In light of the Court's recent Memo and Judgment, I will have to be back with you soon as to our position on your comments below and the status of the case in general." Mr. Colbert replied 45 minutes later: "Just to be clear, if you're not convinced by any of my comments below,[7] we will accept the version you sent that we made our redline suggestions on, with the agreed dollar amounts inserted" [D. 125-12]. The next day, June 19, Mr. McCarty sent a new settlement offer with new terms and a gross settlement amount of $40,000, "in light of what occurred yesterday" [D. 128-14].

Mr. McCarty, in an affidavit, asserts he "t[ook] the offer off the table" with his June 18 e-mail, sent immediately after the opinion and judgment were entered [McCarty Aff. ¶ 17]. Plaintiff, arguing from the premise that an agreement existed at this point, views the e-mail an attempt to withdraw from the agreement [D. 129, p. 7]. The Court has found there was no agreement at this point, so the question is whether the Plaintiff's attempted acceptance is effective.

When either party manifests intent not to enter into a contract, the offer terminates. Feldman, *supra* § 4:23. Thus, an offeree's power of acceptance will be terminated by a counter-offer, unless the offeror manifests intent to renew the original offer. *See* Restatement, *supra* § 39 cmt. a, illus. 1; *Sefers v. Chrysler Corp.*, 1991 WL 46662, *3-4 (Tenn. Ct. App. Apr. 8, 1991) (adopting Restatement § 39 in accord with mirror image rule from *Canton Cotton Mills*, 257 S.W. at 402).

On June 18, Plaintiff attempted to "accept" the original draft Release sent by Defendant on June 1 [D. 125-8]. Yet on June 11, Plaintiff submitted a counter-offer in the form of the redline

---

[7] That is, the comments discussed in II.B, *supra* [*See* D. 125-11].

draft [D. 125-9]. Defendant manifested no intent after that point to renew their original offer. Further, Mr. McCarty's June 19 e-mail, offering $40,000, quite clearly terminates the power of acceptance with respect to any previous offer by reducing the settlement price 75%.

After sending the June 11 counter-offer, Plaintiff had no power to accept the original offer, and any hint that Defendants meant to keep the previous offer open evaporated when Mr. McCarty sent his e-mail after the opinion and judgment were entered on June 18. Because the Court has not found the parties reached agreement at any stage of the negotiations, the Court need not address Plaintiff's contention that Defendants' could not withdraw from a prior agreement.

## IV. CONCLUSION

The Court reaffirms the holdings of this circuit favoring the settlement of disputes without litigation. The Court is aware that, many times, cases are resolved with much less detailed written agreements than the original May 24 agreement, at issue here. But, ultimately, a settlement agreement is nothing more than a contract, and the Court may only enforce settlement agreements upon finding there is, in fact, an agreement to enforce.

Applying Tennessee law, the findings are as follows. First, the Court finds the parties did not form a contract on May 29, and that the parties considered the release necessary to the agreement. Second, the Court finds agreement had not been reached on all material terms of the settlement and release on the afternoon of June 18. Third, Plaintiff's own June 11 counter-offer terminated her power of acceptance with respect to any previous offer, and any attempt by Plaintiff to accept a prior offer after that date was ineffective. Because the parties never reached an enforceable agreement on all material terms at any point, the Court will deny Plaintiff's motion.

Accordingly, Teri Myers's motion to enforce the settlement agreement for a sum of $160,000 [D. 123] is **DENIED**. The Court will refile the previously withdrawn Memorandum Opinion and Judgment granting Defendants' motions for summary judgment and dismissing this case with prejudice.

**IT IS SO ORDERED.**

**UNITED STATES DISTRICT JUDGE**